DECISION (As to defendants Hamlin and Bennett)
The genesis of this litigation lies on a deed from Joseph P. Earle to Harriet T. Greene dated December 19, 1881 and recorded in the Land Evidence Records of the Town of North Kingstown.
The pertinent language which created the difficulties follows:
 ". . . This grantor grants to said grantee her heirs and assigns forever while in possession of the afore-granted premises a right of way twelve feet wide . . . from said premises to tide water of Narragansett Bay."
The original plaintiff herein was Harold B. Archer as Executor of the Estate of Winfred E. Saretzki. Throughout much of the events which constitute the facts basic to this adjudication, the late Winifred E. Saretzki, who died in June 1987 and her husband William Saretzki who died in June of 1975 were the owners of Lot 20 on Assessor's Plat 90, and were the principal players in the events from 1954 through 1987 which have the greatest impact on the courts conclusion. The owners of Lot 20, the Saretzkis, held title to the servient estate over which the right of way lay, and for which under the 1881 deed served the dominant estate comprising the various parcels which were carved out of the 1881 parcel and some of which were owned by the defendants, i.e., Lots 44, 21.
It must also be noted that Natalie Hamlin and Nancy Bennett were respectively the great granddaughter and the great, great granddaughter of Harriet Greene, so that the Richmonds, Hamlins, Bennetts, Earles and Greenes were related.
The Saretzkis acquired Lot 20 in 1954 and had rented from the prior owners for some years before.
In 1954, Elizabeth Archer (the wife of the Harold Archer) who was a daughter to the Saretzkis was 30 years old and had two sisters who were deceased at the time of trial and when the case was filed in 1991 by her husband, Harold Archer, as Executor of the Estate of Winfred E. Saretzki.
In 1954, Natalie Hamlin was 28, her daughter Nancy Hamlin Bennett was born in 1957, her son William in 1952; her son Robert in 1953. Edith Marion, Peter Marion's mother rented the property on Lot 22 and in 1974 acquired title with her husband. It was conveyed to Peter Marion in 1982, at a time when Peter was 34 years old, having been born in or about 1948 and thus when the events began in the early 50's was a toddler — being about 6 years old in 1954.
The Richmonds, the parents of Natalie Hamlin and grandparents of Nancy Bennett acquired their property in October of 1932 at a time when Natalie was about 6. This was Lot 21 (See Exhibit #1).
The Bennetts acquired Lot 44 in April of 1981 at which time Nancy Bennett was 24.
Lots 20 (Saretzki), 21 (Hamlin), 44 (Bennett) and 22 (Marion) were utilized as summer residences by the people and principally occupied from late May to early September. Natalie Hamlin's parents were teachers, which accounted for their schedule.
Testimony from Elizabeth Archer and William Watkins, a nephew of Mrs. Archer and a grandson of the Saretzkis, recalled periodic meetings between the Richmonds, generally Mr. Richmond alone and Dr. Saretzki, principally, when permission would be asked to cross Lot 20 in a general easterly direction to get to a stairway on the northeast corner at a bluff at the end of Lot 20, to go down to what the parties have denominated as North Beach, which permission was readily given. Then at the end of the summer, they, Dr. Saretzki and William Richmond and sometimes their wives, would again meet, with Mr. Richmond thanking the Saretzkis for the use of a path to North Beach as well as all their kindnesses. Over the summer the Saretzkis and the Richmonds would often get together for friendly chats.
Needless to say, Natalie Hamlin and Nancy Bennett recall no such meetings, even though from 1954 on, Nancy Bennett, who was born in 1957 was not likely to have any specific recollection of these meetings until about 1963 at which time the activity between the Richmonds and Saretzkis were more routine than a formal get together.
The history of events given by the witnesses clearly indicates the following conclusions which this Court accepts as true facts.
 (a) The Hamlin's' children and the Archer and Watkins' children played together in their pre-teen days.
 (b) Mrs. Saretzki had rules as to what went on at North Beach (1) no swearing, no dogs and no rock throwing; and (2) if an auto was used to transport beach equipment, it was to drive to the bluff and then brought to the drive, a distance from the bluff and parked there.
 (c) There were regular get togethers by the families of the Saretzkis, the Richmonds and others in the community for "beach" parties, cook-outs, lobster bakes, etc. — especially the 4th of July and Labor Day.
 (d) William Richmond was a "fastidious" person who generally dressed in proper attire as distinguished from casual. He did not drink spirits.
 (e) Bobby Hamlin often cut grass on and around areas where the Hamlins and Bennetts crossed.
 (f) Nancy Hamlin Bennett, when she married, asked permission to have her guests park in the drive and then to use North Beach to swim.
 (g) The visits to North Beach, pre 1954, by Natalie Hamlin were often done because there was no one in residence at Lot 20.
 (h) The plats and maps from 1881 and thereafter showing what may be construed as a right-of-way pass along the southern boundary of Lot 20, going eastward to the inlet from Narragansett Bay to Duck Cove, although the markings do not continue to the corner.
 (i) There was a bridge going over the inlet to the land on the other side, i.e., east of the inlet, on which a bath house once existed. This was destroyed by natural forces and a subsequent bridge erected. The second bridge was also destroyed. There was no time sequence indicated only an implication that the second bridge was destroyed in the 1938 hurricane.
 (j) William Richmond requested permission of Dr. Saretzki to put a boat in Duck Cove in order to get his children and beach goers to the beach at Lone Tree Point as the beach east of the inlet was called because the bridges were no longer there.
 (k) Edith Marion, before she owned Lot 22, then renting it, would go to the inlet along with Natalie Hamlin and both would use the boat to get their children to the beach at Lone Tree Point. These children were toddlers, i.e., 5, 6 and 7 or thereabouts.
 (l) There was visible evidence of a cement platform on the beach at Lone Tree Point indicating there had been a beach house there at one time.
 (m) When a time came that the beach at Lone Tree Point was being abused by partying, leaving glass along the beach, Natalie advised Edith Marion that there was "another beach we can use because there's nobody living there," meaning North Beach.
 (n) The Richards, who were prior owners of Lot 20, i.e., before the Saretzkis, were seldom there; in fact, the building had partially burned and was uninhabitable, this was just pre 1954.
 (o) Edith Marion asked for permission of the Saretzkis to use North Beach and insisted that her son, Peter, also ask permission.
 (p) The title witnesses could not exactly locate the right of way as stated in the deed, but it is conceded that there was a single right of way across Lot 20 but it could not be precisely located by looking at the deed but through later evidence of activities by the interested parties, it can be determined where it was.
All the conclusions previously recited already establish and the Court finds that a single right of way to the tide water of Narragansett Bay traversed Lot 20 in a general easterly direction, abutting the northerly side of Duck Cove, along the southerly line of Lot 20 to a point at the inlet to Duck Cove from Narragansett Bay.
Said right of way is appurtenant to and for the benefit of Lots 21 and 44 and inure to the benefit of the defendants Donald Hamlin, Natalie Hamlin, William C. Bennett and Nancy H. Bennett.
There is no evidence that the deed established multiple rights of way, but clearly, based on the prior usage by owners of the real estate in the 1881 deed, indicated a single right of way to the inlet leading to Lone Tree Point.
While the principle stated by the defendants that "where an easement of way is granted without designating the precise locations thereof, the grantees of such way are entitled to a convenient, suitable and accessible way, having regard to the interest and convenience of the owners of the land, as well as the owner of the dominant estate" is correct, the evidence indicates that prior to 1954 or thereabouts, the principal area for bathing was at Lone Tree Point. The question of where the right of way lay only came to the fore in the 1980's. Before then, the predecessors of the Richmonds, Hamlins and Bennetts as well as they, identified the right of way as the nearest route to the inlet where the bridges were located to get to Lone Tree Point, a fact which Mrs. Hamlin indicated to in her testimony, (see finding m) Thus, the quoted principle does not apply in this case.
The plaintiffs argue that since the Bennetts only improved Lot 44 in 1989 that they have no ability to establish adverse possession over Lot 20. The right of way attempting to be established by prescription, is not appurtenant to any land, but is an easement in gross, i.e. personal. As an easement in gross, personal to them it would cease upon their abandonment, waiver or other action indicating a cessation of the right or upon their death. It is not an inheritable estate to be passed on to their heirs, as would an appurtenant easement tied to a deeded interest, but is acquired by them by usage over time.
Thus, we get to the question of a prescriptive easement. Mrs. Hamlin indicates that she and her parents were going to North Beach, as well as Lone Tree Point, from the 30's on. This conflicted with Mrs. Marion's testimony that she was introduced to North Beach by Natalie Hamlin around the middle 50's when their children were young and they could go to North Beach as no one was living there (on Lot 20) and by implication under no claim of right.
In order to establish a prescriptive easement, the following elements must be satisfied:
 1. the use is actual — the Court doesn't believe any one disputes this.
 2. the use is open — same result.
 3. the use is notorious — without getting into the philosophical distinctions between actual, open and notorious — the Court will concede this.
 4. the use is hostile. When we view the fact that the only direct evidence on this issue arose in the late 1980's when the parcel (Lot 20) was up for sale by the Estate, all the activity over the years from 1954 on, were cordial, neighborly and gracious with friendly relations between the Saretzkis, the Richmonds, Hamlins, Bennetts and Marions. The Court finds that the defendants failed to establish any hostility by clear and convincing evidence. In fact, the clear and convincing evidence establishes a permissive use by the defendants.
 5. The use must be under a claim of right for 10 years — in light of the finding in #4, the defendants failed to so establish.
In conclusion, although this case has numerous defendants, the only persons affected by this decision are the Hamlins and Bennetts. The other defendants have either withdrawn or have had a separate hearing.
Decision is hereby entered for Roland P. Cardi as the successor in interest to Lot 20, formerly owned by the late Winifred Saretzki.
This Court finds that the plaintiff has proven his entitlement to a determination that the right of way stated in the 1881 deed was a twelve foot right of way commencing at the terminus of Elm Street as it enters Lot 20, and then proceeds easterly along the southerly line of his land and abuts the northerly shore of Duck Cove to the tidewaters of Narragansett Bay at a point in the southeast corner of Lot 20 where the inlet for Narragansett Bay meets Duck Cove.
The Court also finds and concludes that the defendants have failed to present by clear and convincing evidence that they have acquired a prescriptive easement over Lot 20 from the terminus of Elm Street going in a north easterly and easterly direction to North Beach, so called.
As a final statement, since the clear and convincing evidence was that the defendants passed over Lot 20 to North Beach by foot and conceded and admitted that any use of the way by auto was by permission only, they cannot acquire a prescriptive easement as Rhode Island General Laws § 34-7-4 which has been in the General Laws since at least 1896 states:
 "No right of footway, except claimed in connection with a right to pass with carriages, shall be acquired by prescriptive or adverse use for any length of time."
The plaintiff will present a judgment in accord with this decision.